**UNITED STATES of America, Plaintiff–Appellant, Cross–Appellee,**

**v.**

**WISCONSIN POWER AND LIGHT COMPANY, Defendant–Appellee, Cross–Appellant.**

Nos. 92–3876, 92–3877.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1993.

Decided Oct. 19, 1994.

Gary R. Allen, David I. Pincus, Frank P. Cihlar (argued), Dept. of Justice, Tax Div., Appellate Section, S. Hollis Fleischer, Dept. of Justice, Tax Div., Washington, DC, for plaintiff-appellant.

Sharon L. King (argued), William J. Weiss, Sidley & Austin, Chicago, IL, William D. Harvey, Wisconsin Power & Light Co., Madison, WI, for defendant-appellee.

Before COFFEY and ROVNER, Circuit Judges, and WILL, District Judge.*

WILL, District Judge.

The United States of America ("Government") filed suit against Wisconsin Power and Light Company ("WPL") to recover an allegedly erroneously issued tax refund for the 1981 tax year. WPL counter-claimed, seeking to obtain additional refunds for the tax years 1975 through 1979. After a bench trial, the district court held in favor of the government. However, the district court later amended its order, concluding that because the government had failed to meet its burden of proof, WPL was entitled to the refund for the 1981 tax year. The district court continued to hold in favor of the government for the 1975 through 1979 tax years. Both sides timely appealed. For the following reasons, we reverse the district court's decision that WPL was entitled to the 1981 refund and affirm the court's decision that WPL was not entitled to the 1975 through 1979 refunds.

## BACKGROUND

WPL, a regulated public utility, elected to use the Asset Depreciation Range ("ADR")[1]

---

* The Honorable Hubert L. Will, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. The ADR system, sometimes referred to as the Class Life Asset Depreciation Range ("CLADR") system, was promulgated in 1971. Taxpayers could elect to apply this system to property placed in service before December 31, 1980. For property placed in service after that date, the ADR system was superseded by the Accelerated Cost Recovery System ("ACRS"). However, the ADR repair allowance continued to be in effect for expenditures which, although incurred after December 31, 1980, were for the repair, mainte-

system of depreciation and to apply the ADR "repair allowance" on its 1975 through 1979 original tax returns and on its first amended 1981 return. Under this system, certain expenditures which typically would be capitalized can be treated as repair allowances and, thus, deducted as expenses. However, other items, called "excluded additions" are so capital in nature that the taxpayer must capitalize these expenditures.

During the years in question, WPL extended electrical service to new customers through overhead or underground distribution circuits. For record-keeping purposes, these "customer service drops" were written up on quarterly work orders. On its returns, WPL treated the expenditures listed on the quarterly work orders as "excluded additions" and placed these into "vintage accounts," which were capitalized.

On April 19, 1987, WPL filed amended returns for the tax years 1975 through 1979. On April 11, 1989, WPL filed a second amended return for the year 1981. On all of these amended returns, WPL changed its treatment of the customer service extension expenditures from "excluded additions" to "repair allowance" expenditures, which allowed WPL to deduct these expenditures immediately instead of capitalizing them. Accordingly, WPL filed claims for refunds for 1975 through 1979 in excess of four million dollars and for 1981 in the amount of $145,584.

For the 1975 through 1979 tax years, the Internal Revenue Service ("IRS" or "Service") disallowed in full the repair allowance deductions claimed for the customer service extension expenditures. However, on July 4, 1989, the IRS issued a refund check to WPL for the 1981 tax year in the amount of $322,-245 ($145,584 in refund and $176,661 in interest). On January 25, 1991, the IRS requested that WPL repay this refund, claiming that it had been issued erroneously. WPL informed the IRS that it thought the refund was correct and would not repay it. The government then brought this action, seeking to recover the refund for 1981, and WPL answered and counterclaimed for a refund of

income taxes for the years 1975 through 1979.

Prior to trial, both sides moved for summary judgment. The government contended that WPL was barred from amending its returns because it had not obtained the consent of the commissioner prior to changing its method of accounting. WPL contended that the government was barred from bringing this lawsuit based on the statute of limitations. In addition, the government urged the court to find, as a matter of law, that customer service extensions were excluded additions. Likewise, WPL urged the court to find that the expenditures for customer service drops were characterized properly as repair allowance deductions. The district court rejected the change in accounting and statute of limitations defenses and found that neither side had presented a satisfactory method of characterizing the expenditures for customer service drops. A bench trial was held to determine whether expenditures for customer service extensions were repair allowance expenditures which should have been expensed or excluded additions which should have been capitalized.

At first, the district court ruled in favor of the government. However, in an amended order, the district court ultimately rejected both the government's and WPL's characterization of the expenditures, as it had at the summary judgment stage, but held in favor of WPL for the 1981 tax year, finding that the government had failed to meet the burden of proof necessary for a return of a refund, and held in favor of the government for the 1975 through 1979 tax years because WPL had failed to meet the burden of proof which would have entitled them to the refunds for those years.

The government appeals the district court's decision regarding the 1981 tax year and also appeals the district court's determination that WPL did not change its method of accounting in contravention of the regulations. WPL appeals the district court's decision regarding the 1975 through 1979 tax years.

nance, rehabilitation, or improvement of property placed in service before January 1, 1981.

## DISCUSSION

■■■ On appeal, we review the district court's interpretation of a regulation *de novo* and review the district court's findings of fact for clear error. *See Eli Lilly & Co. v. Commissioner of Internal Revenue*, 856 F.2d 855, 861 (7th Cir.1988). The district court's application of the law to a particular set of facts is reviewed under the clearly erroneous standard. *Id.* We review *de novo* the district court's grant or denial of summary judgment. *Fort Wayne Com. Schools v. Fort Wayne Educ. Ass'n*, 977 F.2d 358, 361 (7th Cir.1992).

### A. Treasury Regulation § 1.167(a)–11(d)(2)(vi)

The IRS has long made the distinction between depreciable capital expenditures and deductible repair expenses. *See* Treas.Reg. §§ 1.162–4 and 1.263(a)–1(b). However, expenditures sometimes have characteristics of both capital expenditures and deductible expenses and, consequently, it is often difficult to determine how to treat the expenditures. The ADR "repair allowance" was promulgated "[t]o provide a means of resolving the disputes which frequently arise as to whether an item constitutes a deductible repair expense or a nondeductible capital expenditure." H.R.Rep. No. 92–533, 92d Cong., 1st Sess. 134, 1972–1 C.B. 498, 516; S.Rep. No. 92–437, 92d Cong., 1st Sess. 50, 52, 1972–1 C.B. 559, 587.

For taxpayers who elect to use the ADR "repair allowance," Treasury Regulation § 1.167(a)–11(d)(2) provides a simplified procedure for determining whether expenditures should be treated as deductible expenses or capital expenditures. Under this system, taxpayers may automatically deduct up to a set percentage of all repair expenditures for the year, except for those expenditures considered "excluded additions." At issue in this case is whether customer service extensions should be deducted as repairs or whether they are excluded additions.

The regulation specifically enumerates seven types of excluded additions. Only expenditures which fit within one of these categories are considered excluded additions. The parties agree that only one category of excluded additions could apply in this case:

The term "excluded addition" means—

\* \* \* \* \* \*

(d) An expenditure for an identifiable unit of property if

(1) such expenditure is for an additional identifiable unit of property, or (2) such expenditure . . . is for replacement of an identifiable unit of property which was retired.

Treas.Reg. § 1.167(a)–11(d)(2)(vi)(d).

The regulation supplements this definition by defining several of the terms used. A unit of property "generally consists of each operating unit (that is, each separate machine or piece of equipment) which performs a discrete function and which the taxpayer customarily acquires for original installation and retires as a unit." The regulation also provides that "both in the case of machinery and equipment and in the case of a building, for the purposes of applying (d)(1) of this subdivision a unit of property may consist of a part in or a component or portion of a larger unit of property." The regulation defines a unit of property for subsection (g), which involves replacements of utility property,[2] as "each segment which performs a discrete function either as to capacity, service, transmission or distribution between identifiable points."

For the purposes of subsection (d), units of property differ depending on whether the expenditure was for additional property or replacement property. The regulation illustrates this idea by comparing the treatment of two air conditioning units:

An automobile air conditioner is also an identifiable unit of property for the purposes of (d)(1) of this subdivision, but not for the purposes of (d)(2) of this subdivision. Accordingly, the addition of an air conditioner to an automobile is an excluded

---

**2.** Subsection (g) provides:

In the case of those units of property of pipelines, electric utilities, telephone companies, and telegraph companies consisting of lines, cables and poles (in addition to (a) through (e) of this subdivision which also apply to such property), an expenditure for replacement of a material portion of the unit of property.

addition under (d)(1) of this subdivision, but the replacement of an existing air conditioner in an automobile is not an excluded addition under (d)(2) of this subdivision (since it is merely the replacement of a part in an existing identifiable unit of property).

The regulation also provides several examples which help illustrate the application of the "repair allowance" procedures. Example (8) is particularly relevant because it applies to utility property:

Taxpayer Y, an electric utility company, has in addition to others, the following units of property: (1) A high voltage transmission circuit from the switching station (at the generating station) to the transmission station; (2) a series of 100 poles (fully dressed) supporting the circuit in (1); (3) a high voltage circuit from the transmission station to the distribution substation; (4) a high voltage distribution circuit (either radial or looped) from the distribution substation; (5) a transformer on a distribution pole; (6) a circuit breaker on a distribution pole; and (7) all 220 (and lower) volt circuit (including customer service connections) off the distribution circuit in (4). In 1971, taxpayer Y pays or incurs the following expenditures for the repair, maintenance, rehabilitation or improvement of repair allowance property: (1) Replaces 25 adjacent poles in a unit of property consisting of the 300 poles supporting a radial distribution circuit from a distribution substation; (2) replaces a transformer on one of the poles in (1); (3) replaces a cross-arm on one of the poles in (1); (4) replaces a 200–foot section of a 2–mile radial distribution circuit serving 100 residential customers; and (5) replaces a 2,000–foot section on a 10–mile high voltage circuit from a transmission station to a distribution substation which was destroyed by a casualty which taxpayer Y treated as an extraordinary retirement under paragraph (d)(3)(ii) of this section. Expenditure (1) is an excluded addition under (g) of this subdivision. Expenditure (2) is an excluded addition under (d)(2) of this subdivision. Expenditures (3) and (4) are not excluded additions. Expenditure (5) is an excluded addition under (e) of this subdivision.

## B. *Classification of Customer Service Extensions*

In order to decide if customer service drops are excluded additions, we must determine the applicable "unit of property." The parties disagree on how to apply the regulation's definition of "unit of property." The government contends that under the regulations, any expenditure which performs a discrete function is a unit of property, and if this unit of property is an addition, that unit of property may be part of a larger unit of property and may still be considered an excluded addition under (d)(1). WPL maintains that the provision allowing a subdivision of a unit of property is applicable only to machinery, equipment, and buildings, not to utility property. According to WPL, for utility property the definition of unit of property for subsection (g) is applicable and, thus, a unit of property "generally consists of each segment which performs a discrete function as to capacity, service, transmission and distribution between two points." WPL contends that this definition makes no provision for subdivisions of units of property and also establishes that utility property should be treated differently from machinery and equipment. WPL also maintains that example (8) provides substantial guidance in determining the appropriate units of utility property.

The regulation itself is not entirely clear on how to define units of property for utility property and both of the interpretations advanced by the parties to determine a unit of property are plausible. Subsection (g) does apply to utility property and the text following the definitions of excluded property does not clearly specify whether the definition of unit of property for expenditures described in subsection (g) applies only to the expenditures described in subsection (g) or to all utility property. In this section of the regulation, the sentence describing the unit of property for subsection (g) directly follows the sentence describing the treatment of component parts as units of property for machinery and equipment under subsection (d)(1). This juxtaposition suggests that machinery and equipment should be treated dif-

ferently from utility property. However, the general definition of "unit of property" refers to "each operating unit (that is, each separate machine or piece of equipment) which performs a discrete function...." This definition suggests that any operating unit, including a unit of utility property, is considered machinery or equipment and, thus, the special treatment of additions to machinery and equipment under subsection (d)(1) applies to utility property.

While a plain reading of the regulation does not address specifically the appropriate classification of utility property, the IRS has published a Revenue Ruling which discusses the precise type of expenditure considered here. *See* Rev.Rul. 78–67. In that ruling, the taxpayer incurred expenditures for "light watchmen" and

> [e]xpenditures incurred in connection with extension of the distribution system to service one or more residential customers. These expenditures are for the wire service connection including poles, arrestors, and wires off a primary distribution circuit. These installations are made on an "as needed" basis and are not part of a general plan to service an area. They provide electric service to customers that otherwise had no service and do not replace any previous installations.

The taxpayer used the ADR system.

The IRS determined that the extensions of a distribution system to service residential customers were excluded additions. In determining this, the Service noted that

> a unit of property generally consists of each operating unit (that is, each separate machine or piece of equipment) that performs a discrete function and that the taxpayer customarily acquires for original installation and retires as a unit. Section 1.167(a)–11(d)(2)(vi) further provides, however, that a unit of property may consist of a part in or a component of a larger unit of property for the purposes of applying section 1.167(a)–11(d)(2)(vi)(d)(1).

The IRS then concluded that "the acquisition of customer extensions are expenditures for additional identifiable units of property that are components of a larger unit of property"

and therefore each expenditure for an additional item was an excluded addition.

■ The IRS's position articulated in Revenue Ruling 78–67 is entitled to considerable weight. "Although the Service's interpretive rulings do not have the force and effect of regulations, we give an agency's interpretations and practices considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use." *Davis v. United States,* 495 U.S. 472, 484, 110 S.Ct. 2014, 2022, 109 L.Ed.2d 457 (1990) (citations omitted). Furthermore, "[w]hen the construction of an administrative regulation rather than a statute is at issue, deference is even more clearly in order." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

■ The Service has long followed the position articulated in Revenue Ruling 78–67. Revenue Ruling 78–67 was issued in 1978. Prior to the publication of this ruling, the Service issued a General Counsel Memorandum dated October 20, 1977, ("GCM 37297") which discussed the proposed revenue ruling which later was issued as Revenue Ruling 78–67. Although GCMs have no precedential value, they are "helpful in interpreting the Tax Code when 'faced with an almost total absence of case law.'" *Morganbesser v. United States,* 984 F.2d 560, 563 (2d Cir. 1993), quoting *Herrmann v. E.W. Wylie Corp.,* 766 F.Supp. 800, 802–03 (D.N.D.1991).

GCM 37297, which discussed the same utility property expenditures considered in Revenue Ruling 78–67, demonstrates that in issuing Revenue Ruling 78–67 the IRS specifically intended to reject the idea that expenditures for additional identifiable units of property must satisfy the general definition of "unit of property." After rejecting this idea, the GCM states that "expenditures for an additional unit of property, whether or not the unit of property serves a discrete function independent of the function of the unit of property of which it is made a part or is

generally retired as a separate unit, are excluded additions under Treas.Reg. § 1.167(a)–11(d)(2)(vi)(d)(1)." The memo later states, "[t]he Regulations adopt a definition of 'unit of property' that is broader in scope for additions to existing property than for replacements thereto.... [A]n additional unit of property need not perform a discrete function independent of the function of the unit of property of which it is made a part nor need it be customarily retired as a separate unit."

■ Further, after the publication of Revenue Ruling 78–67, the IRS followed the ruling in Technical Advice Memorandum ("TAM") 813008. Technical advice memoranda are issued to the taxpayer whose accounting practices are at question and taxpayers may not rely on memoranda received from the Service by another taxpayer, and the Code provides that they cannot be used or cited as precedent. 26 U.S.C. § 6110(j)(3). Thus, this Court typically does not consider arguments which cite technical advice memoranda as precedent. *See e.g., Fox Valley & Vicinity Const. Workers Pension Fund v. Brown,* 897 F.2d 275, 280 n. 2 (7th Cir.1990) (en banc). However, on at least one occasion, this Court has cited technical advice memoranda as evidence of administrative practice, not as authoritative interpretations of the Code. *See Harco Holdings, Inc. v. United States,* 977 F.2d 1027, 1035 n. 13 (7th Cir.1992), *amended on denial of rehearing en banc,* (1992) (citing private letter ruling as evidence of erroneous or inconsistent agency position). In TAM 813008, a regulated producer of electricity requested a reconsideration of a previous TAM which determined units of property and excluded additions for electric utility distribution system property additions and replacements. One of the expenditures consisted of "a new secondary circuit and the necessary distribution transformer, conductors, and poleline devices ... installed to meet increased load requirements of existing customers and one added customer. Services were reconnected to switch some of the existing customers to the new circuit." The Service cited Revenue Ruling 78–67, and concluded that "[t]he secondary circuit is a replacement and should be judged for material-

ity (using the 5% rule) by comparison to its unit of property—all secondary circuits of the supplying primary circuit. The transformers and the new service are excluded additions irrespective of the results of this materiality test."

In fact, the only document issued by the IRS which has been inconsistent with the Service's treatment of expenditures for additions to utility property is the technical advice memorandum upon which WPL relies to support its interpretation of the regulations. In TAM 8615008, the Service held that expenditures for additional customer service extensions were not excluded additions. However, the Service later revoked TAM 8615008 and, thus, this technical advice memorandum does not represent the Service's position on this issue.

The Service consistently has adhered to the position expressed in Revenue Ruling 78–67. Furthermore, the Service's interpretation of the regulation has been reasonable. Repair allowance property includes expenditures for repair, maintenance, rehabilitation, or improvements. The terms repair, maintenance, rehabilitation, and improvements all imply the existence of an item prior to the act of repairing, maintaining, rehabilitating, or improving the item. Although the addition of a customer service drop might be considered an improvement to the distribution circuit, in reality the customer service extension serves a discrete function which had not existed prior to the addition: the distribution of electricity from the prior circuit to a new customer. This is how the distribution circuit expands and, in fact, the district court noted that WPL's distribution system expanded and its income increased largely through these customer service extensions. To characterize these expenditures as mere repairs or improvements of the pre-existing system is to mischaracterize grossly the impact these extensions have for both the new customers and WPL.

WPL contends that we should not apply Revenue Ruling 78–67 to this case because revenue rulings are limited to their specific facts and this ruling is factually distinguishable from this case because it also discussed

light watchmen. However, this argument has no merit. Although Revenue Ruling 78–67 addresses light watchmen in addition to customer service drops, it is clear from the ruling that the Service considered the expenditures for light watchmen and customer service drops independently.

■ WPL also urges that Revenue Ruling 78–67 should not be followed because it is inconsistent with the holding in TAM 8615008. As discussed above, however, technical advice memoranda may not be used or cited as precedent, and this circuit typically does not consider arguments based on these memoranda. In any event, the IRS has revoked TAM 8615008. Nevertheless, WPL attempts to convince us that we should apply TAM 8615008 to this case, stating that because the Service revoked the TAM without giving reasons, the revocation was not retroactive in effect. *See* Sections 11.03 and 11.04 of Rev.Proc. 88–2, 1988–1 C.B. 571. WPL contends that because the Service applied TAM 8615008 to some taxpayers and continues to apply it retroactively to those taxpayers, we should require the Service to apply the TAM to other taxpayers. However, after issuing the TAM, the Service was bound to apply it only to the taxpayer for which the advice was sought and, even while the TAM was in effect, the TAM was not applicable to WPL. Likewise, after its revocation, the Service was obligated to apply TAM 8615008 retroactively only to the particular taxpayer to which it had been issued.

We find that the Service's construction of Treasury Regulation § 1.167(a)–11(d)(2)(vi)(d)(1), as expressed in Revenue Ruling 78–67, has been in long use and is not plainly erroneous or inconsistent with the regulation. Therefore, we give the Service's construction of the regulation considerable weight in determining the issues in this case. Despite its controlling weight, however, the district court did not rely on Revenue Ruling 78–67 and, in fact, did not mention the ruling in either of its opinions. Instead, the court rejected the government's unit of property based on its reading of example (8), a reading which was consistent with TAM 8615008, but inconsistent with Revenue Ruling 78–67.

In its order, the district court rejected the government's contention that "any extension of service, regardless of the components of that extension, constitutes a unit of property," stating that "[t]his approach is practically unworkable and entirely inconsistent with the definition of units of property contained in the regulations." Amended Order at 4. The court then quoted the definition of unit of property for subdivision (g) and, citing example (8), stated that a unit of property could not contain several separate identifiable parts. In support of its conclusion, the court relied heavily on the fact that customer service drops were not identifiable units of property as recognized by example (8).

However, as Revenue Ruling 78–67 plainly indicates, additions are treated differently from replacements. Example (8) discusses units of property for replacement purposes only and, therefore, simply is not applicable to this case. Instead, the court should have followed Revenue Ruling 78–67 and recognized that an addition of any identifiable unit of property is an excluded addition which should be capitalized.

A customer service drop is an identifiable unit of property. At trial, it was established that during the years in question WPL consistently wrote up quarterly work orders for customer service drops. The customer service drops written up on these orders sometimes consisted of a single line of wire emanating from the secondary circuit to the new customer and sometimes required additional primary and secondary circuits, as well as lines to the customer. But regardless of the component parts required, customer service drops were the means by which WPL supplied electricity from a pre-existing line to its new customers. These extensions were listed on the quarterly work orders as customer service drops and are easily identifiable as such. Since taxpayer already has been identifying customer service drops on its work orders, it is not "unworkable" for it to continue to do so.

Further, since units of property differ for additions and replacements, adopting as a unit of property any new customer service extension does not necessarily require WPL to reclassify its established units of property

for replacement purposes. In other words, just because customer service drops are appropriate identifiable units of property for classifying additions does not mean that other units of property consistent with example (8) are not appropriate for the purposes of classifying replacements.

■ WPL argues that, according to the treasury regulation, the government was required to accept WPL's classification of units of property because they are reasonable and proper. Immediately after Treasury Regulation § 1.167(a)–11(d)(2)(vi) provides the general definition for units of property, the regulation states, "[t]he taxpayer's accounting classification of units of property will generally be accepted for purposes of this subdivision *provided the classifications are reasonably consistent with the preceding sentence* and are consistently applied." (emphasis supplied). The fact that WPL had established units of property and consistently had applied those classifications during the years in question is not determinative for two reasons. First, WPL's units of property were not consistent with the regulation's treatment of additional units of property and thus the Service is not obligated to accept these units of property even though consistently applied. Second, even though the Service did accept WPL's classification for the years in question, this was in light of WPL's prior treatment of the expenditures in question. When WPL attempted to treat these expenditures differently, the Service was no longer obliged to accept these units of property. As the district court stated, "[E]quity does not demand that where the United States accepts a prior characterization it continues to be bound by a subsequent amendment claiming substantially greater deductions than those claimed on the original return. To hold otherwise would permit a taxpayer to parlay a minor deduction into a subsequent major deduction by estopping the government from objecting to its methodology." Amended Order at 9.

C. *Replacement Property Expenditures*

■ WPL maintains that even if we do not accept its unit of property, we should allow some of the refunds for each year since it is undisputable that some of the expenditures contained on the quarterly work orders were for replacement property. The district court held that the defendant had failed to establish an appropriate unit of property for the replacement expenditures and therefore it was not possible to determine whether the replacement expenditures met the 5% materiality test required under subsection (g). In addition, the district court found that the small sample analysis used to determine the cost of replacements exposed the evidence to inaccuracies and lack of reliability.

In order to prevail on this issue, WPL must prove that the district court erred in determining that it had failed to establish an appropriate unit of property *and* that the district court erred in holding that WPL's evidence lacked reliability. For the purposes of our discussion, it does not matter if WPL did in fact establish appropriate units of property, for WPL clearly did not establish through reliable evidence the amount to which it was entitled for replacement expenditures.

■ The burden of showing the right to a claimed deduction is on the taxpayer. *See, e.g., Hefti v. Internal Revenue Service,* 8 F.3d 1169, 1173 (7th Cir.1993). Whether the taxpayer has produced sufficient evidence to support a deduction is a question of fact which we review for clear error. *See Betson v. Commissioner of Internal Revenue,* 802 F.2d 365, 367 (9th Cir.1986). At trial, WPL's witness admitted that the replacement cost figures were not maintained on a job-by-job basis, but instead were determined by using a random sample of the work orders to estimate the replacement costs. Tr. at 185, 191. As a result, WPL did not know the actual cost of replacement expenditures. Further, the work orders were not analyzed on an individual basis to determine whether replacements exceed five percent of the unit of property. Tr. at 197. After hearing all the evidence, the district court concluded that, as a result of the small sample size, the figures lack the reliability necessary to determine the amount to which WPL would be entitled. The district court's decision is supported by the record and, therefore, was not clearly erroneous.

### D. *Change in Accounting Method*

Because we hold that WPL was not entitled to deduct the customer service additions under its repair allowance, we do not reach the question of whether this was a change in accounting method which required the consent of the commissioner.

### CONCLUSION

Wisconsin Power and Light was not entitled to a refund for any of the tax years in question and failed to establish the amount it was entitled to recover for replacement expenditures during those years. Accordingly, to the extent that the district court held in favor of Wisconsin Power and Light, the judgment of the district court is reversed; to the extent that the district court held in favor of the United States, the judgment of the district court is affirmed.

REVERSED in part, AFFIRMED in part.